UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **MATTHEW B. FRISCH and THE FRISCH AGENCY, LLC,** | : | CIVIL CASE NO. |
| | : | 2:12-cv-00415-GLF-MRA |
| | : | |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| **NATIONWIDE MUTUAL INSURANCE COMPANY and NATIONWIDE BANK**, | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## THE FRISCH PLAINTIFFS' OPPOSITION TO NATIONWIDE'S MOTION TO DISMISS

JAMES R. LEICKLY (0038309)
Trial Attorney
145 E. Rich Street, Second Floor
Columbus, OH 43215
TEL:  614 475-5174
FAX: 614 428-8645
EMAIL: James@Leicklylaw.com

WILLIAM P. TEDARDS, JR.
(DC Bar No. 143636)
Admitted Pro Hac Vice
1101 30th Street, N.W., Suite 500
Washington, DC 20007
TEL:  202 797-9135
FAX:  202 797-9139
EMAIL: skeener@tedards.net

Counsel for Plaintiffs

DATED: July 19, 2012

# TABLE OF CONTENTS

Page No.

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

I.      INTRODUCTION AND SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     STANDARD GOVERNING MOTIONS TO DISMISS:
        THE *TWOMBLY* PLAUSIBILITY STANDARD.. . . . . . . . . . . . . . . . . . . . 2

III.    ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.      Earlier Releases Do Not Bar These 2009 Causes of Action
                That  Accrued in 2009. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

        B.      Each Count of the Complaint States a Cause of Action
                Against Nationwide. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

                1.      Count 1 – Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . 6

                        (a)     Nationwide's termination of the relationship
                                prior to August 2009 breached the Modified
                                AE Agreement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

                        (b)     The decision to terminate was not made in
                                August or September of 2009.. . . . . . . . . . . . . . . . . 9

                        (c)     The   termination   provision   in   the   IC
                                Agreement is not relevant.. . . . . . . . . . . . . . . . . . . 10

                2.      Count 2 – Breach of the Covenant of Good Faith and
                        Fair Dealing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

                3.      Count 3 – Fraud. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                        (a)     The applicable statute of limitations is Ohio's
                                four-year statute... . . . . . . . . . . . . . . . . . . . . . . . . . 13

THE FRISCH PLAINTIFFS' OPPOSITION TO NATIONWIDE'S MOTION TO DISMISS
*Frisch, et al. v. Nationwide, et al.*
ii                          CIVIL CASE NO. 2:12-cv-00415-GLF-MRA

(b) The parol evidence rule does not bar a fraud in the inducement claim. . . . . . . . . . . . . . . . . . . . . . . . 15

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

THE FRISCH PLAINTIFFS' OPPOSITION TO NATIONWIDE'S MOTION TO DISMISS
*Frisch, et al. v. Nationwide, et al.*
CIVIL CASE NO. 2:12-cv-00415-GLF-MRA

iii

TABLE OF AUTHORITIES

Page No.

**CASES**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 554 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

*Curl v. Greenlee Textron, Inc.*,
    404 F.Supp.2d 1001 (S.D. Ohio 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Drew v. Christopher Constr. Co., Inc.*,
    (1942), 140 Ohio St. 1, 23 O.O. 185, 41 N.E.2d 1018. . . . . . . . . . . . . . . . 15

*Galmish v. Cicchini*,
    90 Ohio St.3d 22 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

*Littlejohn v. Parrish*,
    163 Ohio App.3d 456 (First District 2005). . . . . . . . . . . . . . . . . . . . . . 2, 11

*Logsdon v. Ohio Northern Univ.* ,
    68 Ohio App.3d 190 (Ohio App.1990), 587 N.E.2d 942. . . . . . . . . . . . . . . 5

*Metro Life Ins. Co. v. Triskett Illinois, Inc.*
    97 Ohio App.3d 228 (Ohio App.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Union Mut. Ins. Co. of Maine v. Wilkinson*,
    (1871), 80 U.S. (13 Wall.) 222, 231-232, 20 L.Ed. 617. . . . . . . . . . . . . . . 15

**STATUTES**

Parol-Evidence Rule; Right to Show Fraud in Inducement or
Execution of Written Contract (1928), 56 A.L.R. 13. . . . . . . . . . . . . . . . . . . 15

THE FRISCH PLAINTIFFS' OPPOSITION TO NATIONWIDE'S MOTION TO DISMISS
*Frisch, et al. v. Nationwide, et al.*
iv    CIVIL CASE NO. 2:12-cv-00415-GLF-MRA

## <u>OTHER</u>

Restatement (Second) of Conflict of Laws § 142 (1988). . . . . . . . . . . . . . . . . . . . 14

Restatement (Second) of Contracts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

50 Ohio Jur.3d § 18 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

THE FRISCH PLAINTIFFS' OPPOSITION TO NATIONWIDE'S MOTION TO DISMISS
*Frisch, et al. v. Nationwide, et al.*
v                    CIVIL CASE NO. 2:12-cv-00415-GLF-MRA

## I.     INTRODUCTION AND SUMMARY

The essential allegation of the Complaint is that Nationwide terminated the Frisch plaintiffs' entire relationship with Nationwide in early 2009 (a) in breach of the Modified AE Agreement (Doc #1-4, Exhibit 4 to the Complaint) and pursuant to a three-year scheme that (b) breached the contractual covenant of good faith and fair dealing and (c) constituted a fraud.

These claims, which did not accrue until early 2009, are not subject to releases that Nationwide extracted (fraudulently) from all of the AE agents during 2007-2008, and the fraud claim (Count 3) is not governed by the Pennsylvania statute of limitations.  Nationwide's sweeping choice of law and forum selection provision in the Modified AE Agreement (Doc #1-4, ¶ 25 at Page ID #66) mandates the application of Ohio law to all issues, "regardless of any conflicts of law provision requiring reference to the rules of decision in, and/or laws of another state ... ."  (Doc #1-4, ¶ 25 at Page ID #66.)  Even if Nationwide had not imposed this sweeping choice of law mandate, Ohio's statute of limitations would still govern this action under Ohio's conflict of law principles.

Each of the three counts in the Complaint states a claim under all applicable Rule 12(b)(6) standards, including the plausibility standard of *Bell Atl. Corp. v. Twombly*, 550 U.S. 554 (2007).  Count 1 (breach of contract) contains all the elements of a breach of contract and is the subject of a separately-filed cross-motion

for partial summary judgment with respect to the liability portion.  Count 2 (breach of the covenant of good faith and fair dealing) is a *contractual* cause of action (Nationwide's motion mistakenly focuses on a *tort* cause of action that does  not exist) which meets Ohio's criteria, as summarized, for example, in *Littlejohn v. Parrish*, 163 Ohio App.3d 456 (First District 2005).  Count 3 (fraud) satisfies all of the elements of a fraud in the inducement claim, as summarized, for example, in 50 Ohio Jur.3d § 18 (2011).  The fraud claim is not barred by the parol evidence  rule (as Nationwide mistakenly suggests).  The parol evidence rule bars consideration of prior oral or written agreements, but "[i]t was never intended that the parol evidence rule could be used as a shield to prevent the proof of fraud ... " *Galmish v. Cicchini*, 90 Ohio St.3d 22, 28 (2000).

## II.    STANDARD GOVERNING MOTIONS TO DISMISS:  THE *TWOMBLY* PLAUSIBILITY STANDARD

Nationwide's brief suggestion that this Complaint is not "plausible" under the *Twombly* standards (Doc #10, Motion to Dismiss, at Page ID #130) rests on an inaccurate *factual assertion* (Nationwide lost "tens of millions of dollars" in the AE program) which contradicts several allegations in the Complaint, including for example: ¶¶ 1 and 14 (Doc #1, Complaint, at Page ID #1-2, 5):  AE program drove "unusually rapid short-term revenue growth for Nationwide;" ¶¶ 62-53 (*Id.*, Page ID #21-22):  Frisch produced large amounts of "high quality and very profitable"

business for Nationwide; ¶ 13 (*Id.*, Page ID #4):  Nationwide's rapid expansion comes "at the expense of agents, who pay for the expansion via loans from the Bank"); and ¶¶ 1 and 61 (*Id.*, Page ID #2, 21):  terminated businesses resold by Nationwide to others (Frisch business resold to Durante for $85,000).

Apart from the inaccuracy of Nationwide's conclusory assertion, one does not invoke the *Twombly* standards by presenting competing factual allegations.  Under *Twombly*, and all other Rule 12(b)(6) standards, the "assumption [is] that all of the allegations in the complaint are true (even if doubtful in fact)."  (*Twombly* at 555.) The issue is whether the facts as alleged present a "plausible" claim even if "actual proof of those facts is improbable" and "a recovery is very remote and unlikely."  (*Id.* at 556.)

## III.    ARGUMENT

### A.    Earlier Releases Do Not Bar These 2009 Causes of Action That Accrued in 2009.

Nationwide presents two releases that it extracted from the AE agents in 2007-2008.  The first, contained in the January 26, 2007 Memorandum of Understanding ("MOU"), states that it covers:

> all claims which Agent may have against Nationwide, its affiliates, subsidiaries, successors and assigns, whether known or unknown, which were or could have been asserted against Nationwide from the beginning of time until the date of this MOU.

(Doc #1-3, the MOU, Page ID #52.)  The second, contained in the May 15, 2008

Modified AE Agreement, states that it covers:

> all claims or causes of action Agent has in any way relating to the AE Program, the AE Agreement, and the IC Agreement from the beginning of time to the present, including, but not limited to, any claims for fraud, negligence, breach of contract, or any statutory claims.

(Doc #1-4, Modified AE Agreement, Page ID #64.)  The essential difference between

the two, apart from their dates, is that the 2007 release covers unknown claims and

the 2008 release does not.

Neither release, however, connects to the claims in this Complaint, which

accrued in early 2009.  One could not argue that these claims "could have been

asserted" in January of 2007 or that Mr. Frisch "[h]ad" any "claims or causes of

action" in May of 2008.  Mr. Frisch operated very successfully under the AE program

until Nationwide terminated its relationship with him in early 2009:

> 62.    During the four years that he developed and operated his Nationwide agency, Mr. Frisch was one of the top performers in his district and state.  In the 2006-2007 period, for example, Mr. Frisch recorded a 122.5 percent annual growth rate in a state with a 2.3-3.5 percent growth objective, in which the three next best agency growth rates were 33.2 percent, 14.0 percent, and 13.1 percent, with two-thirds of the agents *declining*.  Over the 2008-2009 period, Mr. Frisch continued to grow rapidly, while Nationwide's business in the state as a whole *declined* by approximately 4%, primarily because Nationwide had raised its homeowner insurance rates to non-competitive levels.

> 63.    Mr. Frisch's business was also of high quality and very profitable for Nationwide.  His three–year loss ratio figures (i.e., the ratio of claims paid to premiums collected) as of the first quarter of 2009 were in the 30-35% range, well below the 62% that Nationwide considers desirable.  (The lower the figure, the more profitable the business is for Nationwide.)

(Doc #1, Complaint, Page ID #21-22.)[1]

A *sine qua non* with respect to the accrual of breach of contract and fraud claims is that the claim does not exist and cannot be brought until an injury occurs.  See, e.g. 50 Ohio Jur.3d § 18 (2011) (discussing fraud in the inducement):  a claim of fraud consists of the following six elements  ... (6) a resulting injury. ...  Elements of a fraud claim are conjunctive, and accordingly, all of them must be shown.  See also, *Metro Life Ins. Co. v. Triskett Illinois, Inc.*, 97 Ohio App.3d 228, 235 (Ohio App. 1994): dismissing a fraudulent inducement claim, stating "the evidence presented below establishes no causative link between a fraudulent representation made by Metlife and damage sustained by Triskett.  See *Logsdon v. Ohio Northern Univ.* (1990), 68 Ohio App.3d 190, 196, 587 N.E.2d 942, 947 (holding that plaintiff's fraud claim failed in the absence of proof of resulting injury)."

---

[1]Nationwide's assertion that Mr. Frisch was complaining about the program in the earlier stages (Doc #10, Page ID #122) is not based on fact.  Nationwide is asking the Court to *infer* that Mr. Frisch must have complained because Nationwide put boiler-plate statements that agents had complained in the forms it used for the MOU's and the Modified AE Agreements -- statements that were designed to deceive the agents into believing that Nationwide was helping them when it forced them to switch to the Modified AE Program.

In this case, Mr. Frisch had no injury and no contractual or tort cause of action prior to March 30, 2009, when Nationwide issued its Notice of Probation and set up a three-month path to termination based on the new production requirements in the Modified AE Agreement.  (See Doc #1, Complaint, at ¶¶ 52-55, Page ID #18-20.) Both releases are completely out of range.[2]

## B.    Each Count of the Complaint States a Cause of Action Against Nationwide

### 1.    Count 1 – Breach of Contract

The main breach of contract claim in Count 1 is that Nationwide failed to comply with the termination provision in the Modified AE Agreement when it terminated its relationship with the Frisch plaintiffs.  The Complaint alleges that Nationwide issued a notice on March 30, 2009 that Mr. Frisch was being placed on probation due to a production "shortfall" in February of $3,045 -- the first shortfall that Mr. Frisch had recorded.  The Notice stated that if he failed to meet the minimum requirements over the three-month "probation" period his contract could be terminated.  (Doc #1, Complaint, ¶¶ 52-53, Page ID #18-19.)  Simultaneously, Nationwide began to pressure Mr. Frisch to turn over his business to Nationwide and

---

[2]Nationwide makes a cursory statement that the fraud claim "necessarily accrued *before* Frisch signed the modification."  That would be impossible if injury is an element.  But even if there were some basis for that theory, the injury would have been completely unknown and, given Nationwide's deception, undiscoverable.  Having removed the coverage of "unknown" releases from the 2008 version, Nationwide could not maintain that Mr. Frisch intended to release this claim.

depart.  On June 17, 2009 Nationwide announced the termination of his contract. (*Id.*, ¶¶ 54-55, Page ID #19-20.)  Over the next three months, Nationwide escalated the pressure, setting up another agent to purchase Mr. Frisch's business from Nationwide, encouraging other agents to hire Mr. Frisch's employees and take Mr. Frisch's accounts.  Through it all, Mr. Frisch refused to relinquish his business, eventually prompting Nationwide to issue a termination letter.  (*Id.*, ¶¶ 56-60, Page ID #20-21.)

> **(a)    Nationwide's termination of the relationship prior to August 2009 breached the Modified AE Agreement.**

The Modified AE Agreement specified the two alternative grounds upon which Nationwide would terminate the relationship for failure to meet the production requirements, stating that "the Agent's relationship with Nationwide shall be terminated and this Agreement and the Agent's IC Agreement shall be cancelled" upon either of the following two events:

> Agent (a) is not meeting the requirements of the Modified Minimum Production Plan as of the six-month anniversary of the Effective Date of this Agreement, and (b) fails to meet the requirements of the Modified Minimum Production Plan for one quarter thereafter

> or

> (a) Agent successfully meets the requirements of the Modified Minimum Production Plan as of the six-month anniversary of the Effective Date of this Agreement, but

> then (b) fails to meet the requirements of the Modified
> Minimum Production Plan for two successive quarters
> thereafter

(Doc #1-4, Modified AE Agreement, Page ID #57.)  Neither scenario had occurred when Nationwide made the  decision to terminate Mr. Frisch's relationship with Nationwide, communicated it to Mr. Frisch, began to pressure him to leave on his own, and set out to transfer his business to others.  According to Nationwide's own reports, the first shortfall of $3,045 did not occur until February of 2009, nine months into the Modified AE Agreement (and three months past the sixth month anniversary), so that the first ground could never apply.  With respect to the second ground, "two successive quarters" (i.e., six straight months) of monthly shortfalls could not have begun prior to February 2009 and could not have ended prior to August 2009, well after Nationwide communicated the termination decision, began to pressure Mr. Frisch to depart, and started to transfer his business.

Nationwide's baseless suggestion in its Motion to Dismiss that "[i]t was quite possible that Frisch fell short of his minimum production goals at the six-month anniversary of the Effective Date of [the Modification] ... ." (Defendants' Motion to Dismiss, Doc #10, Page ID #125) directly contradicts the clear allegation in the Complaint that "[T]here was no shortfall in the preceding months."  (Doc #1, Complaint, ¶ 53, Page ID #19.)

Nationwide's argument that "there are absolutely no allegations in the Complaint to support Frisch's conclusory statement that Nationwide fabricated a shortfall in his DWP" (Doc #10, Page ID #124) is irrelevant here.  For purposes of the breach of contract claim, we *assume* that the $3,045 shortfall Nationwide identified for February 2009 was accurate.

### (b)    The decision to terminate was not made in August or September of 2009.

In its Motion, Nationwide also suggests that the decision to terminate might not have been made until shortly before the delivery of the letter on September 4, 2009, implying that two successive quarters of monthly shortfalls between February and August of 2009 could have triggered a later decision to terminate at the end.  (Doc #10, Page ID #125.)  Viewing  the chronology of events between February and August of 2009, including the announcement of the termination on June 17, 2009, however, no fact finder could reasonably conclude that Nationwide was simply performing the contract normally during that period and did not consider terminating the relationship until the end of the period.

Among other things, Nationwide could not possibly claim with a straight face that it expected Mr. Frisch to meet a steadily-increasing production schedule during the February-August period with Nationwide interfering so heavily in his business,

telling him the arrangement was terminated, trying to drive him out, and transferring his accounts to others.

> **(c)     The termination provision in the IC Agreement is not relevant.**

In its Motion, Nationwide also argues that the parties' mutual right to cancel the separate IC Agreement with or without cause provides a defense to the claim that Nationwide breached the Modified AE Agreement.  (Doc #10, Page ID #124.)  What Nationwide overlooks is that the termination of the IC Agreement, which separately governs the terms of agency appointments by various Nationwide entities (Doc #1-4, Modified AE Agreement, at Page ID #54) was simply a ministerial by-product of the termination of the Modified AE Agreement, which ended the entire relationship.  As the Modified AE Agreement states, in the event of a failure to meet the minimum production requirements as specified, "*the Agent's relationship with Nationwide shall be terminated* and this [Modified AE] Agreement and the Agent's IC Agreement shall be cancelled."  (*Id*., at Page ID #57 (emphasis added).)  With the entire relationship at an end there would obviously be no basis for continuing to maintain appointments with Nationwide entities.

The fact that the parties also had a mutual right to cancel the IC Agreement separately is not relevant to the legality of a decision under the AE Agreement to end

the entire relationship. This point is reinforced by Article 11 of the AE Agreement
(carried over into the Modified AE Agreement by ¶ 24) stating:

> Should any of the provisions of this Agreement be found to
> be in conflict with any provisions of any other agent
> agreements currently in effect between Nationwide and
> Agent, those provisions set forth in this Agreement shall
> control.

(Doc. #1-1, Article 11 at Page ID #41 and Doc #1-4, ¶ 24 at Page ID #66.)

## 2. Count 2 – Breach of the Covenant of Good Faith and Fair Dealing

The only point Nationwide makes in connection with the covenant of good
faith and fair dealing claim is that the courts do not recognize a *tort* cause of action.
Nationwide is correct about that, but this is a *contractual* claim, not a tort claim. The
Complaint states that Nationwide "breached the covenant of good faith and fair
dealing, *which was implied in each of the three contracts between Nationwide and
Mr. Frisch.*" (Doc 1, Complaint, ¶ 78 at Page ID #27)(emphasis added).

The implied covenant of good faith and fair dealing exists in all contracts
governed by Ohio law. See, e.g., *Littlejohn v. Parrish*, 166 Ohio App.3d 456, 463 (1st
Dist. 2005): "[E]very contract contain(s) an implied duty for the parties to act in good
faith with each other." Explaining the implied obligation further:

> As stated by the Restatement Second of Contracts, "Good
> faith performance or enforcement of a contract emphasizes
> faithfulness to an agreed common purpose and consistency
> with the justified expectations of the other party." It also

states that bad faith may consist of inaction, or may be the "abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance."

(*Id.*)  The allegations of the Complaint describe a wholesale violation of these principles:

78.    When Nationwide secretly re-designed the program in 2006 -- to assure the eventual termination of the bulk of the estimated 400 participants in the program, most of whom were destined for success under the original program -- and then executed the termination of those agents, like Mr. Frisch, who rejected Nationwide's attempts to persuade them to give up their businesses voluntarily, Nationwide breached the covenant of good faith and fair dealing, which was implied in each of the three contracts between Nationwide and Mr. Frisch.

79.    Nationwide acted in bad faith at every step of this process:  (a) providing fabricated performance reports with "hidden" rows and columns during the period of the initial AE Agreement, to give agents the impression prior to the modification that they were doing poorly when, in fact, most were exceeding their production requirements; (b) telling agents that the program was being changed in response to agent concerns and modified to improve the chances for success when, in fact, the purpose of the modification was to set the agents up for termination; (c) concealing from the agents the wholesale change in Nationwide's distribution model, which called for *reductions* in the exclusive agent force, rather than an expansion; (d) restricting the agents' options, telling them they would have to exit the program and surrender their businesses or agree to the new Modified AE Agreement; (e) extracting releases under fraudulent circumstances, with all of Nationwide's true intentions and purposes concealed; (f) switching the method of measuring the minimum production requirements in the Modified AE Agreement

from the "cumulative" method to the far more difficult "12 month moving" method, without any explanation or discussion; (g) manipulating the new production requirements in the Modified AE Agreement to temporarily increase the monthly requirements sharply after the first six months, so that agents could be set up for termination (typically in the first half of 2009); then (h) terminating agents using the "12 month moving" method on the artificially-inflated monthly production requirements, confiscating their business, and reselling their books of business to others.

80.    Mr. Frisch was subjected to all of the elements of this deceptive scheme, which culminated in the termination of his contract and the confiscation and resale of his book of business in September of 2009.

(Doc #1, Complaint, ¶¶ 78-80 at Page ID #27-28.)

**3.    Count 3 – Fraud**

**(a)    The applicable statue of limitations is Ohio's four-year statute.**

In trying to present the Pennsylvania statute of limitations, Nationwide is running away from and ignoring its own sweeping choice of law and forum selection provision:

Governing Law And Choice Of Forum

25.    As of the Effective Date, Article 14 of the AE Agreement is hereby deleted and replaced in its entirety by the following:

"It is hereby agreed by the parties that this Modification and the AE Agreement shall be governed by the laws of the State of Ohio, regardless of any conflicts of law provision

> requiring reference to the rules of, decision in, and/or laws of another state or sovereign nation and that any action or proceeding arising from a dispute concerning the Modification or the AE Program shall be brought in Franklin County, Ohio."

(Doc #1-4, ¶ 25 at Page ID #66.)  This provision pre-empts the analysis and leaves no room for the application of Ohio's conflict of law rules to determine if the general rule that the forum applies its own procedural statute of limitation is to be followed or if another state's statute is to be used.

Even if Nationwide did not have this all-encompassing dictate that Ohio law must be used for all purposes, a conflict analysis would produce the same result. Essentially, Ohio would apply the 1988 Revision of § 142 of the Restatement of Conflicts, which reads as follows:

> Whether a Claim will be maintained against the defense of the statute of limitations is determined under the principles stated in § 6.   In general, unless the exceptional circumstances of the case make such a result unreasonable:
>
> (1) The forum will apply its own statute of limitations barring the claim.
>
> (2) *The forum will apply its own statute of limitations permitting the claim unless:*
>
> (a) maintenance of the claim would serve *no substantial interest of the forum; and*
>
> (b) the claim would be barred under the statute of limitations of a state having *a more significant relationship to the parties* and the occurrence.

Restatement (Second) of Conflict of Laws § 142 (1988) (emphasis added). See, e.g.,

*Curl v. Greenlee Textron, Inc.*, 404 F.Supp.2d 1001, 1012 (S.D. Ohio 2005). It

cannot be said that Ohio has "no substantial interest" in this matter, so the confict

analysis would produce the same result: application if Ohio's four year statute of

limitation for fraud claims.

### (b) The parol evidence rule does not bar a fraud in the inducement claim.

As stated above in the introduction, the parol evidence rule was "never

intended" to be "used as a shield to prevent the proof of fraud." *Galmish*, *supra*, at

28. The policy reasons for refusing to allow defrauders to escape via the parol

evidence rule are broad and deep:

> [T]he parol evidence rule does not prohibit a party from
> introducing parol or extrinsic evidence for the purpose of
> proving fraudulent inducement. *Drew v. Christopher
> Constr. Co., Inc.* (1942), 140 Ohio St. 1, 23 O.O. 185, 41
> N.E.2d 1018, paragraph two of the syllabus. See, also,
> *Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S.
> (13 Wall.) 222, 231-232, 20 L.Ed. 617, 622. As explained
> in Annotation, Parol-Evidence Rule; Right to Show Fraud
> in Inducement or Execution of Written Contract (1928), 56
> A.L.R. 13, 34-36:
>
> > "The principle which prohibits the application
> > of the parol-evidence rule in cases of fraud
> > inducing the execution of a written contract *
> > * * has been regarded as being as important
> > and as resting on as sound a policy as the
> > parol-evidence rule itself. It has been said that
> > if the courts were to hold, in an action on a

written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

"Fraud cannot be merged; hence the doctrine, which is merely only another form of expression of the parol-evidence rule, that prior negotiations and conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud." (Footnotes omitted.)

(*Id.*)

## CONCLUSION

For the reasons stated, Nationwide's motion to dismiss should be denied.

DATED: July 19, 2012

Respectfully submitted,

*/s/ James R. Leickly*

JAMES R. LEICKLY (0038309)
Trial Attorney
145 E. Rich Street, Second Floor
Columbus, OH 43215
TEL:  614 475-5174
FAX: 614 428-8645
EMAIL: James@Leicklylaw.com

WILLIAM P. TEDARDS, JR.
(DC Bar No. 143636)
Admitted Pro Hac Vice
1101 30th Street, N.W., Suite 500
Washington, DC 20007
TEL:   202 797-9135
FAX:  202 797-9139
EMAIL: skeener@tedards.net

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on July 19, 2012, the foregoing document was filed in the above-referenced docket via the CM/ECF system and thereby served on the following counsel of record:

Quintin F. Lindsmith          qlindsmith@bricker.com
Natalie Furniss               nfurniss@bricker.com
James. P. Schuck              jschuck@bricker.com

*/s/ William P. Tedards, Jr.*

_____
WILLIAM P. TEDARDS, JR.