IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MATTHEW B. FRISCH, et al.,

    Plaintiffs,

v.

NATIONWIDE MUTUAL INSURANCE
COMPANY, et al.,

    Defendants.

Case No. 2:12-cv-415
Judge Gregory L. Frost
Magistrate Judge Mark R. Abel

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' motion for partial summary judgment as to Defendant Nationwide Mutual Insurance Company's ("Nationwide") liability on Count One (breach of contract) (ECF No. 14), Nationwide's combined response to Plaintiffs' motion and cross-motion for summary judgment on Count One of Plaintiff's Complaint (ECF No. 25), Plaintiffs' opposition to Nationwide's cross-motion for summary judgment (ECF Nos. 28), and Plaintiffs' and Nationwide's respective replies in support of their motions (ECF Nos. 27 and 32). For the reasons set forth below, the Court **DENIES** Plaintiffs' Motion (ECF No. 14) and **GRANTS** Nationwide's motion (ECF No. 25). With its ruling today, combined with the Court's prior ruling on Defendants' motion to dismiss (Opinion and Order, ECF No. 34), the Court has disposed of all the claims asserted in Plaintiffs' Complaint. Accordingly, the Court enters final judgment in favor of Defendants.

### I.    Background

Plaintiff Matthew Frisch was formerly an independent contractor agent for Defendant Nationwide Mutual Insurance Company ("Nationwide"); Frisch owned his own Nationwide

1

agency, the Frisch Agency LLC, which is also a Plaintiff in this action.[1]  Frisch became a Nationwide agent in 2005 after Nationwide district manager Jesse Gorczynski recruited Frisch to become a "career exclusive agent" with Nationwide's Agency Executive Program ("AE Program").  (Compl. ¶33, ECF No. 1.)  Mr. Frisch and Nationwide entered into an Agency Executive Program Performance Agreement ("AE Agreement") on September 1, 2005.  (ECF No. 25-3, PAGEID#289.)

At the same time that the parties entered into the AE Agreement, they also entered into a separate agreement, entitled the "Independent Contractor Agent's Agreement" ("IC Agreement").  (ECF No. 25-2, PAGEID#282.)  Under the terms of the IC Agreement, Nationwide formally appointed Mr. Frisch as its agent to represent Nationwide within the state of Pennsylvania.  (*Id.*)  The IC Agreement specified that Mr. Frisch was an independent contractor and not an employee.  (*Id.*)  The IC Agreement also specified that either party to the IC Agreement could cancel the parties' agency relationship at any time with or without cause.  (*Id.* at § 10, PAGEID#284.)  In October 2006, Nationwide and the Frisch Agency entered into a Corporate/LLC Agency Agreement ("Corporate Agency Agreement"), which likewise provided that the Agency acted as an independent contractor of Nationwide and that the agency relationship could be canceled "at any time with or without cause" upon written notice.  (ECF No. 25-4 at § 10, PAGEID#317.)  The Corporate Agency Agreement superseded the IC Agreement.

As for the AE Agreement, it had a 36-month term during which Frisch was subject to certain production requirements.  According to Nationwide, Exhibit A to the AE Agreement was a document titled "AE DWP Planning Tool," which specified that Frisch was required to meet a "Minimum Production Plan" of $1.2 million in direct written premium (DWP) for the 36-month

---

[1] Unless the context dictates otherwise, the Court will refer to Plaintiffs collectively as "Frisch."

term of the agreement.  (ECF No. 25-3, PAGEID#301.)  For his part, Frisch alleges that there was no "Exhibit A" attached to the AE Agreement at the time he executed it.  (Compl. ¶ 17.)  According to Frisch, however, Nationwide "sent misleading and deceptive reports" to Frisch, misstating a higher minimum production requirement.  (*Id.* at ¶ 18, 39.)  Frisch alleges that he was well ahead of his production requirements but that, by mid-2006, Nationwide was "secretly planning to reduce the exclusive agent population" and did not intend for agents like Mr. Frisch to complete the initial agreement.  (*Id.* at ¶ 41.)  By the end of 2006, Frisch alleges that Nationwide "devised a plan" that would force agents to exit the AE Program or enter into modified AE Agreements that were "designed for failure."  (*Id.*) Agents who chose to enter the modified AE Agreements would have to release Nationwide from liability for "all legal causes of action that had accrued up to that point."  (*Id.*)

The Complaint alleges that Nationwide carried out that scheme in Frisch's case.  On January 26, 2007, Frisch executed a Memorandum of Understanding ("MOU").  (ECF No. 25-5, PAGEID#324.)  The MOU recited that the parties intended to "resolve issues" in connection with the AE Program.  Under the MOU's terms, in consideration of Nationwide's promise to pay $15,000 and to reimburse up to $35,000 in business related expenses, Frisch agreed to "completely release and forever discharge any and all claims which Agent may have against Nationwide, its affiliates, subsidiaries, successors and assigns, whether known or unknown, which were or could have been asserted against Nationwide from the beginning of time until the date of this MOU."  (*Id.*)  The MOU also specified that Frisch would prepare and submit to Nationwide a "Certified Business Plan" and that Nationwide and Frisch would thereafter develop a "Negotiated Business Plan."  (*Id.* at PAGEID#325.)

3

Frisch alleges that Nationwide showed no interest in reaching the Negotiated Business Plan described in the MOU. (Compl. ¶ 45.) Instead, in May 2008, Nationwide presented Frisch (and other agents) with a document called the "First Modification to Agency Executive Performance Agreement" ("Modified AE Agreement"). (*Id.* at ¶ 46 and Ex. 4; ECF No. 25-6, PAGEID#326.) Nationwide and Mr. Frisch executed the Modified AE Agreement on May 15, 2008. (*Id.* at PAGEID#340.)

According to Frisch, the Modified AE Agreement was designed to set up him and his agency for failure. Specifically, Frisch complains that the Modified AE Agreement changed the method of measuring adherence to the minimum production requirement to a "12 month moving period" and that a new "minimum production plan was imposed," with the effect of requiring "a temporary sharp increase in the amount of new business that Mr. Frisch would have to write." (Compl., ¶¶ 47a and 47b.) Further, the Modified AE Agreement entitled Nationwide to terminate the agreement after the first six months if Frisch did not meet the new minimum production requirements for two successive quarters. (*Id.* at ¶ 47c.)

All of these terms Frisch complains of were spelled out in the Modified AE Agreement. Also contained in the Modified AE Agreement was another release, similar to the one in the MOU that Mr. Frisch signed in January 2007. The release states that Frisch "hereby releases and discharges Nationwide . . . of any and all claims or causes of action Agent has in any way relating to the AE Program, the AE Agreement, and the IC Agreement from the beginning of time to the present, including, but not limited to, any claims for fraud, negligence, breach of contract, or any statutory claim." (ECF No. 25-6, at § 19, PAGEID#336.)

Importantly with regard to the motions now before the Court, Section 4 of the Modified AE Agreement introduced the Modified Minimum Production Plan applicable to Frisch. In turn,

Section 5 of the Modified AE Agreement spelled out the expectation that Frisch would meet the requirements of the Modified Minimum Production Plan:

> *All requirements of the Modified Minimum Production Plan must be met on a monthly basis throughout the terms of this Agreement*, including the Property and Casualty Direct Written Premium ("P&C DWP") *and* Life Sales components. Policies must be paid and delivered in order to count toward the Modified Minimum Production Plan requirements.  P&C DWP shall be defined here in as the sum of all Agent's direct written premiums from Nationwide P&C policies during the previous 12 month period and shall be calculated on a 12 month moving basis as outlined in Exhibit A to this Modification.  The total cumulative Life Sales required, as outlined in Exhibit A to the Modification, will be measured monthly, and Agent must meet quarterly Life Sales targets each quarter until Agent achieves the cumulative Life Sales requirement for that particular year.
>
> . . .
>
> Agent further agrees and understands that in the event (a) Agent successfully meets the requirements of the Modified Minimum Production Plan as of the six-month anniversary of the Effective Date of this Agreement, but then (b) fails to meet the requirements of the Modified Minimum Production Plan for two successive quarters thereafter, *the Agent's relationship with Nationwide shall be terminated and this Agreement and Agent's IC Agreement shall be canceled.*

(*Id.* at § 5, PAGEID#328-329 (emphasis added).)

Thus, under the terms of the Modified AE Agreement, Nationwide held a mandatory contractual right to terminate Frisch and his agency if, following the end of his six-month anniversary, he had two successive quarters in which he failed to meet his Minimum Production Plan.  Exhibit A to the Modified AE Agreement, which Frisch initialed, provided the hard numbers that Frisch was expected to meet in DWP and life sales during the term of the Agreement.

Toward the end of Frisch's first six months of operating under the Modified AE Agreement, Frisch alleges that Nationwide approached Frisch with an "exit opportunity," wanting Frisch to "surrender the entire business to Nationwide" and depart as a Nationwide agent.  (Compl. ¶ 50.)  Frisch declined to exit voluntarily.  As a result, Frisch contends that

5

Nationwide sent him a notice in March 2009, stating that it was placing Frisch on "probation" because of a shortfall in minimum production requirements. (*Id.* at ¶ 53.) The stated shortfall was $3,045 for the month of February 2009. (*Id.*) Frisch denies that there was an actual shortfall, alleging on information and belief that Nationwide underreported Frisch's actual figures. (*Id.*)

Nationwide, however, provides records that purport to show Frisch's consistent failure to meet his minimum production requirements during several months other than February 2009. According to Nationwide's documents submitted in support of its cross-motion for summary judgment, Frisch achieved only 96.88% of his required life sales in December 2008 and only 91.18% of his required life sales in January 2009. (ECF No. 25-7, PAGEID#349-350.) So when Frisch fell short of his 12-month DWP goal in February 2009, Nationwide gave Frisch notice of his shortfall and placed him on the probationary status that Frisch complains of. (ECF No. 25-8, PAGEID#357.)

After placing Frisch on probation, Nationwide allegedly continued to "pressure" Mr. Frisch to turn over his book of business and terminate his agency. (Compl., ¶¶ 54-55.) But while Frisch characterizes these actions as untoward "pressure," Nationwide presents further evidence that Frisch was failing to meet his monthly production goals during this period. Indeed, between March 2009 and July 2009, Frisch fell short of meeting *either* his required life sales or his 12-month DWP number. (ECF No. 25-7, PAGEID#352-356.)

On September 4, 2009, Gorczynski delivered a letter to Mr. Frisch, titled "Notice of Cancellation of Agency Executive Program Performance Agreement and Corporate LLC Agency Agreement." (ECF No. 25-9, PAGEID#362.) The letter stated that Nationwide was terminating Frisch "for reasons that include your failure to meet your Modified Minimum Production Plan

6

subject to your AE Agreement." (*Id.*) The Complaint alleges that Nationwide then sold Frisch's book of business to another agent. (*Id.* at ¶ 61.)

Plaintiffs filed this lawsuit on May 14, 2012, naming Nationwide Mutual Insurance Company and Nationwide Bank as defendants. The Complaint alleges claims for breach of contract (Count 1), breach of the covenant of good faith and fair dealing (Count 2), and fraud (Count 3). Nationwide moved to dismiss Plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (ECF No. 10.) The Court granted in part and denied in part Nationwide's motion: the Court dismissed Counts 2 and 3 of the Complaint, dismissed Count 1 to the extent that it was predicated upon a breach of the IC Agreement, and dismissed the Complaint in its entirety as to Defendant Nationwide Bank. (ECF No. 34, PAGEID#439-447.) The Court denied Nationwide's motion to dismiss Count 1 to the extent based upon a breach of the Modified AE Agreement, finding that Plaintiff pleaded a valid claim for breach of the Modified AE Agreement. (*Id.* at 8-10.)

The parties each move for summary judgment on Count One (breach of contract based on breach of the Modified AE Agreement), the only count of the Complaint that remains after this Court's ruling on Nationwide's motion to dismiss.

## II. Discussion

The parties have filed cross motions for summary judgment, each seeking summary judgment on the breach-of-contract count (Count One) of Plaintiffs' Complaint. Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing

sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### A. Evidentiary Issues

As an initial matter, the Court must address Nationwide's objection to evidence submitted by Frisch in support of Frisch's motion for partial summary judgment. In support of his motion, Frisch attached the declaration of his counsel, William Tedards, Jr., to the reply memorandum. (ECF No. 27-1.) In turn, attached to the Tedards Declaration are various documents that purport to be "excerpts" from various monthly production reports, the cover page of a document titled "Production Shortfall Program," and a page from a report titled "Example Timeline—AE Production Shortfall Program." (ECF Nos. 27-2, 27-3, 27-4, 27-5, 27-6, and 27-7.) Frisch uses the attachments to the Tedards Declaration as purported support for his theory

that Nationwide fabricated its reasons for terminating his agency. The main purpose of the Tedards Declaration itself is to authenticate the attachments to it.

When deciding a motion for summary judgment, the Court may only consider *admissible* evidence. *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). To be admissible, evidence must be properly authenticated. *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x 914, 921 (6th Cir. 2004). But the Tedards Declaration does not meet this standard, as it fails to truly authenticate the documents it purports to place before the Court. In this respect, Tedards' Declaration states simply: "During the course of a lengthy investigation into Nationwide's AE Program and the process by which the Frisch AE contract was terminated, I obtained the materials which comprise Attachments 2 - 6 to this Declaration."

To be competent evidence, declarations or affidavits must be made on personal knowledge. Fed. R. Civ. P. 56(e). As he is neither the custodian nor the creator of Attachments 2 through 6 attached to his Declaration, Tedards lacks personal knowledge of the documents' authenticity. Simply put, Tedards cannot properly authenticate them. *See Harris v. City of St. Clairsville*, No. 2:04-cv-1179, 2006 U.S. Dist. LEXIS 55598, at *6 (S.D. Ohio Aug. 10, 2006). The Court therefore strikes these documents and the accompanying paragraphs of Tedards' Declaration that purport to authenticate them.

Attachment 1 to Tedards' Declaration is a slightly different matter, as that document is simply an enlarged copy of pages from documents authenticated by a Nationwide witness (Jesse Gorczynski) in a declaration attached to Nationwide's motion for summary judgment. (ECF Nos. 25-1 and 25-3.) As to Attachment 1, Tedards' Declaration states:

> Attachment 1 to this Declaration consists of two excerpts from an April 2007 monthly production report that Nationwide transmitted to Mr. Frisch. Nationwide has presented this report in its cross-motion *as the missing Exhibit A to the Agency Executive Program Performance Agreement* that the parties entered into

>on September 1, 2005.  The excerpts are taken from Document 25-3, pages 13 and 15 of 25 (Page ID# 301 and 303).

(ECF No. 27-1, at ¶ 3, PAGEID#381 (emphasis added).)  As to Attachment 1, the problem is not with the document itself, but, rather, with what Tedards says about it.  While Frisch contends that there was no "Exhibit A" attached to the original AE Agreement executed in 2005, the Court does not see any foundation that would allow *Tedards* to testify about what was or was not attached to that Agreement.  Tedards' Declaration provides no basis for personal knowledge with respect to the circumstances concerning Attachment 1's creation or its transmittal to Frisch.  Paragraph 3 of Tedards' declaration is not admissible evidence that the Court can consider under Fed. R. Civ. P. 56(e).

Tedards' Declaration lacks the requisite personal knowledge to be competent evidence or to authenticate the documents it purports to authenticate.  The Court therefore **SUSTAINS** Nationwide's objection to Tedards' Declaration.  The Court **STRIKES** the Tedards Declaration and will not consider it in ruling upon the parties' cross-motions for summary judgment.

### B. Frisch's Motion for Summary Judgment

Frisch moves for partial summary judgment on Count One of the Complaint, alleging breach of contract.  Frisch contends that Nationwide terminated the Modified AE Agreement without any contractual basis for doing so.  In support, Frisch points to Section 5 of the Modified AE Agreement, which provides in pertinent part:

>Agent further agrees and understands that in the event Agent (a) is not meeting the requirements of the Modified Minimum Production Plan as of the six-month anniversary of the Effective Date of this Agreement, and (b) fails to meet the requirements of the Modified Minimum Production Plan for one quarter thereafter, the Agent's relationship with Nationwide shall be terminated and this Agreement and the Agent's IC Agreement shall be canceled.
>
>Agent further agrees and understands that in the event (a) Agent successfully meets the requirements of the Modified Minimum Production Plan as of the six-

10

>month anniversary of the Effective Date of this Agreement, but then (b) fails to meet the requirements of the Modified Minimum Production Plan for two successive quarters thereafter, the Agent's relationship with Nationwide shall be terminated and this Agreement and Agent's IC Agreement shall be canceled.

(ECF No. 25-6, § 5, PAGEID#329.)

Frisch argues that neither of these circumstances occurred to justify cancellation of the Modified AE Agreement. Frisch argues that the first "shortfall" in production occurred in February 2009, nine months after the Effective Date of the Modified AE Agreement, meaning that the first circumstance was necessarily inapplicable. And with respect to the second ground for automatic cancellation, Frisch argues that shortfalls for "two successive quarters" could not have happened prior to August 2009. Rather than being terminated pursuant to the terms of the AE Agreement, Frisch theorizes that Nationwide terminated Frisch and the Frisch Agency pursuant to a "shadow program" called a "Production Shortfall Program." (ECF No. 27, PAGEID#374-376.)

In response, Nationwide sharply disputes Frisch's characterization of the facts. Nationwide directs the Court's attention to evidence showing that Frisch was, in fact, behind production goals set by the Modified Minimum Production Plan. Though Nationwide acknowledges that Frisch met his Minimum Production Plan requirements as of the six-month anniversary of the Modified AE Agreement's Effective Date, Nationwide submits evidence showing that Frisch fell short of at least one of his production requirements in every month between November 2008 and the time Nationwide terminated the Modified AE Agreement. Importantly, Section 5 of the Modified AE Agreement mandated that Frisch meet *all* requirements of the Modified Minimum Production Plan *on a monthly basis* throughout the term of the Agreement (including Property and Casualty DWP *and* Life Sales components). (ECF No. 25-6 at § 5, PAGEID 328-329.)  According to Nationwide, the "all requirements" language

of Section 5 fatally undermines Plaintiffs' claim to partial summary judgment.  Under the plain language of the Modified AE Agreement, Frisch was obliged to meet—at peril of automatic cancellation of the Agreement—*all requirements* of the Modified Minimum Production Plan attached to the Modified AE Agreement (and initialed by Frisch).

The Court easily disposes of Frisch's motion for summary judgment, as Nationwide has presented ample summary judgment evidence to rebut Frisch's claim that Nationwide lacked a contractual basis to terminate his agency.  Because both sides agree that Frisch met the production requirements as of the six-month anniversary of the Modified AE Agreement's Effective Date, Nationwide could cancel the Agreement automatically if Frisch "fail[ed] to meet the requirements of the Modified Minimum Production Plan for two successive quarters." Notwithstanding Frisch's vehement protest that he did not fail to meet those requirements for two quarters, Nationwide has provided evidence that he did, in fact, fail to do so.  Indeed, according to the authenticated evidence provided by Nationwide, there was not a time after November 2008 that Frisch met both the DWP and life sales requirements of his Modified Production Plan:

- In December 2008, Frisch achieved only 96.88% of his required life insurance sales;
- In January 2009, Frisch achieved 91.18% of his required life insurance sales;
- In February 2009, Frisch met his life insurance requirement but failed to meet the DWP number, achieving only 99.63% of his DWP;
- In March 2009, Frisch achieved 98.48% of his required DWP and 94.74% of his required life insurance sales;
- In April 2009, Frisch achieved only 96.28% of his required DWP and 95% of his required life insurance sales;

12

- In May 2009, Frisch achieved only 93.41% of his required DWP and 90.48% of his required life insurance sales;

- In June 2009, Frisch achieved only 93.95% of his required DWP and 86.36% of his required life insurance sales; and

- In July 2009, Frisch achieved only 91.55% of his required DWP and 82.61% of his required life insurance sales.

(ECF No. 25-7, PAGEID#349-356.)

Thus, through February 2009, which marked the end of the first quarter after November 2008 (*i.e.*, the end of Frisch's first six months under the Modified AE Agreement), Frisch failed to meet his 12-month DWP requirement.  Indeed, Frisch acknowledges this much.  (Frisch Decl. ¶ 7, ECF No. 14-1, PAGEID#164.) But Nationwide's evidence also shows that there was a shortfall at the end of the *following* quarter: at the end of May 2009, Frisch was short of his requirements with regard to *both* the 12-month DWP and his required life insurance sales.  (ECF No. 25-7, PAGEID# 354)

Nationwide has therefore presented evidence that Frisch failed to meet all requirements of his Modified Minimum Production Plan.  As such, Nationwide has presented evidence that it acted within its contractual rights to terminate the Modified AE Agreement at the time it did.  The Court therefore **DENIES** Plaintiffs' motion for partial summary judgment with respect to Nationwide's liability under Count One of the Complaint.

C.  **Nationwide's Motion for Summary Judgment**

Having denied Frisch's motion for summary judgment on Count One of the Complaint, the Court now turns to whether Nationwide is entitled to summary judgment.  In its cross motion for summary judgment on Count One, Nationwide argues that it did not breach the Modified AE Agreement as a matter of law because (1) the Corporate Agency Agreement was terminable at will and, if canceled, terminated the Modified AE Agreement automatically and (2) Frisch in any event failed to meet his minimum production goals, thereby rendering termination automatic under Section 5 of the Modified AE Agreement.

With respect to the first argument, Nationwide relies on Section 10 of the Corporate Agency Agreement, which provided that the Agency *or* Nationwide had the right to cancel the Agency Agreement "at any time with or without cause."  (ECF No. 25-4 at § 10, PAGEID# 317.)  And once the Corporate Agency Agreement was canceled, the Modified AE Agreement was automatically canceled.  (ECF No. 25-6 at § 13, PAGEID#335 (incorporating Article 13 of AE Agreement, ECF No. 25-3, at PAGEID#295).)  Thus, according to Nationwide, the Modified AE Agreement contemplated that the "at-will cancellation provision" remained in full force and effect and that Nationwide could not have committed a breach of contract by simply invoking its at-will termination provision.

The Court is not persuaded by Nationwide's argument.  As this Court noted in denying Nationwide's motion to dismiss Count One for failure to state a claim, if this were a case in which Nationwide expressly terminated the *Corporate Agency Agreement*, which in turn led to the automatic termination of the AE Agreement, then this argument would be more persuasive.  (ECF No. 34, PAGEID#436-437.)  But it appears from the evidence of record that this is not what Nationwide actually did.  Rather, the evidence suggests that Nationwide canceled Frisch's

Agency by terminating *the Modified AE Agreement*, not the Corporate Agency Agreement. Indeed, the Notice of Cancellation sent to Frisch by Nationwide reads in part:

> This written notice is to advise you that your Agency Executive Program Performance Agreement ("AE Agreement") and your Corporate/LLC Agency Agreement are cancelled *for reasons that include your failure to meet your Modified Minimum Production Plan subject to your AE Agreement*.  Therefore, any and all other agent agreements and/or related agency contracts and addenda with Nationwide are also hereby cancelled.  Moreover, pursuant to its express terms, the Corporate/LLC Agency Agreement may be cancelled by either party at any time, with or without cause.

(ECF No. 25-9, PAGEID#362 (emphasis added).)

Thus, Nationwide's Notice of Cancellation referred specifically to Frisch's failure to meet the goals of his Minimum Production Plan, thereby invoking the mandatory termination provision of Section 5 of the Modified AE Agreement.  Though the Notice also referred to the at-will cancellation right set forth in the Corporate Agency Agreement, the context of the Notice suggests that Nationwide specifically intended to cancel the Modified AE Agreement due to Frisch's failure to meet his Minimum Production Plan.  At the very least, there is a genuine issue of fact as to whether Nationwide was invoking the mandatory termination provision of the Modified AE Agreement.  If so, Nationwide could theoretically be liable for breach of contract *if* termination was *not* warranted under Section 5 of the Modified AE Agreement.

More problematic for Frisch, however, is Nationwide's second argument for summary judgment.  As set forth previously, Nationwide presents evidence that Frisch failed to achieve his minimum production numbers in *every month* from December 2008 until July 2009, before Nationwide finally terminated Frisch as an agent by notice delivered on September 4, 2009.  This was significant, as Section 5 of the Modified AE Agreement made termination *automatic* if Frisch failed to meet the Modified Minimum Production Plan requirements for two successive quarters following the first six months.  Moreover, Section 5 also provided that Frisch needed to

15

meet Modified Minimum Production Plan requirements on a *monthly* basis, something that Frisch did not do. The evidence shows that Frisch failed to meet his requirements on a monthly basis *and* failed to meet them for the quarters ending in February 2009 and May 2009. Based on the evidence Nationwide has submitted in support of its cross-motion for summary judgment, Nationwide was well within its rights under Section 5 to terminate the Modified AE Agreement with Frisch.

In order to overcome summary judgment, it is incumbent upon Frisch to offer some evidence that would create a genuine factual dispute over whether he was meeting his Minimum Production Goals, such that a reasonable jury could find that Nationwide lacked a basis to invoke Section 5 to terminate the Modified AE Agreement. One way Frisch tries to do this is to argue that Nationwide did not terminate him as an agent under the Modified AE Agreement, but rather under a "shadow" program called the "Production Shortfall Program." (ECF No. 27, PAGEID#368-369, 376.) While Frisch ascribes sinister motive to the existence of something called a "Production Shortfall Program," he fails to establish how its existence makes a whit of difference as far as his breach of contract claim is concerned. Frisch fails to show how the numbers Nationwide used in measuring Frisch's production were any different than those disclosed in the Modified AE Agreement. Nationwide's numbers indicate that Frisch failed to meet his minimum requirements. Whether Nationwide kept track of these numbers under something it called a "Production Shortfall Program" is inconsequential: absent some summary judgment evidence to create a *genuine* factual dispute with respect to Nationwide's production figures, Frisch cannot defeat summary judgment.[2]

---

[2] For its part, Nationwide says that the "Production Shortfall Program" was simply the name Nationwide gave to its method of measuring its agents' progress toward minimum production goals. (Mincy Decl. ¶ 4, ECF No. 32-1, PAGEID#426.)

In another bid to dispute the validity of Nationwide's termination of his agency, Frisch makes much of the fact that there was no "Exhibit A" attached to his original AE Agreement executed in 2005.  (ECF No. 27, PAGEID#366-367, 369-370, 377.)  Frisch pointedly argues that the "Exhibit A" that Nationwide has represented to be the one attached to the original AE Agreement is a "fabrication."  (*Id.*)  But whether the "Exhibit A" submitted by Nationwide as having been attached to the *original* AE Agreement is authentic (or not) is a non-issue for purposes of the cross-motions for summary judgment before the Court.  The original AE Agreement is *not* the operative agreement whose breach the parties are litigating in Count One.  It is the *Modified AE Agreement* executed in *2008* that is at issue.  The Modified AE Agreement contained an Exhibit A, whose existence or authenticity Frisch does *not* dispute; indeed, Frisch appears to have initialed the Exhibit A attached to the *Modified* AE Agreement.  (Gorczynski Decl. Ex. 5, ECF No. 25-6, PAGEID#342.)  Frisch's protestations that Nationwide's proffered Exhibit A to the *original* AE Agreement is "fabricated" is simply a red herring issue.

Finally, the Declaration of Mr. Frisch (ECF No. 14-1), the only competent evidence Frisch submits either in support of Plaintiffs' motion for summary judgment or in opposition to Nationwide's  motion for summary judgment, fails to create a genuine issue of material fact for trial.  Frisch does dispute in his Declaration the notion that he had a minimum production shortfall at any time prior to February 2009.  Even putting aside the questionable nature of this testimony (for example, Frisch focuses exclusively on DWP and does not dispute shortfalls in *life insurance* sales that Nationwide documented), Frisch does not dispute the shortfalls documented by Nationwide in any of the months that followed.  Nor, crucially, does Frisch's Declaration present evidence to dispute Nationwide's figures showing a shortfall at the end of two consecutive quarters (February 2009 and May 2009).  As noted above, the Modified AE

Agreement specified that termination was mandatory if Frisch failed to meet minimum production requirements in successive quarters after November 2008.

Frisch has not only failed to demonstrate his own entitlement to summary judgment on Count One of the Complaint, he has demonstrably failed to present evidence that overcomes Nationwide's motion for summary judgment. Nationwide has shown that it validly terminated Frisch's Modified AE Agreement under the provisions of Section 5 of that Agreement. Frisch has failed to demonstrate a genuine issue otherwise. The Court therefore **GRANTS** Nationwide's motion for summary judgment on Count One.

### III.    Conclusion

For the reasons set forth above, the Court **GRANTS** Nationwide's motion for summary judgment as to Count One of Plaintiff's Complaint (ECF No. 25) and **DENIES** Plaintiff's motion for partial summary judgment (ECF No. 14). Having decided that Nationwide is entitled to summary judgment on the only remaining claim in Plaintiff's Complaint, the Court hereby directs the Clerk to enter final judgment in favor of Defendants.

**IT IS SO ORDERED.**

>          **/s/ Gregory L. Frost**
>          **GREGORY L. FROST**
>          **UNITED STATES DISTRICT JUDGE**